IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

SPINNAKER INSURANCE
COMPANY,                                     :
                                             :
                                             :    Case No. 2:25-cv-00330
            Plaintiff,                       :
                                             :    Judge Algenon L. Marbley
      v.                                     :
                                             :    Magistrate Judge Kimberly A. Jolson
HEART OF GOLD TITLE, LLC,                    :
                                             :
            Defendant.                       :
_____

HEART OF GOLD TITLE, LLC,                    :
                                             :
                                             :
            Counterclaim-Plaintiff.          :
                                             :
      v.                                     :
                                             :
SPINNAKER INSURANCE                          :
COMPANY, *et al.*,                           :
                                             :
            Counterclaim-Defendants.         :


## OPINION & ORDER

This matter is before the Court on Plaintiffs/Counterclaim Defendants Spinnaker Insurance

Company ("Spinnaker") and Cowbell Insurance Agency LLC ("Cowbell")'s Combined Motion to

Dismiss Defendant Heart of Gold Title, LLC's ("Heart of Gold" or "HOGT") Counterclaims and

Motion to Strike. (EFC No. 11.) For the reasons stated below, this Court **GRANTS** the Motion to

Dismiss and **DENIES** the Motion to Strike **as MOOT**.

## I. BACKGROUND

This case is about the obligations of Spinnkaer Insurance to provide coverage to its insured,

Heart of Gold Title, related to an Underlying Lawsuit. Heart of Gold was sued for negligence

1

related to a fraud scam that occurred during a real estate transaction in the Franklin County Court of Common Pleas. Spinnaker contends that neither of the two policies it maintained with Heart of Gold afforded coverage for the Underlying Lawsuit. As such, Spinnaker now seeks a declaratory judgment regarding its obligations under the policies involved. Heart of Gold subsequently filed a counterclaim asserting breach of contract, bad faith, and declaratory judgment against Spinnaker and Cowbell Insurance Agency, LLC.

### A. The Policies

HOGT alleges that it first obtained commercial cyber insurance coverage in July 2023 and later renewed that coverage in July 2024, and it refers to those two policies collectively as the "Policies." (ECF No. 6-1 at 1). The first policy is Policy No. FLY-CB-2TXEM5Y5U-003 (the "2023 Policy" or "Initial Policy"), which lists Heart of Gold Title, LLC as the named insured, Spinnaker Insurance Company as the "Company Name," and Cowbell Insurance Agency LLC as the "Producer Name." (*Id.*). The 2023 Policy was effective from August 7, 2023, to August 7, 2024. (*Id.*).

The second policy is Policy No. FLY-CB-2TXEM5Y5U-004 (the "2024 Policy" or "Renewal Policy"), which again lists Heart of Gold Title, LLC as the named insured, Spinnaker Insurance Company as the insurer, and Cowbell Insurance Agency LLC as the producer. (ECF No. 6-2 at 1). The 2024 Policy was effective from August 7, 2024, to August 7, 2025. (*Id.*).

Both policies are expressly written on a claims-made-and-reported basis, and the declarations pages state that each policy "applies only to claims first made and reported to the insurer during the policy period or any applicable extended period." (ECF Nos. 6-1 at 1; 6-2 at 1).

As relevant here, both policies contain Insuring Agreement 5 "Security Breach Liability Including Payment Card Industry (PCI) Fines and Penalties," which provides coverage for "Loss"

that the insured becomes legally obligated to pay, along with "Defense Expenses," as a result of a "Claim" that is discovered during the policy period or any applicable extended reporting period, for a "Wrongful Act" or series of interrelated wrongful acts. (ECF Nos. 6-1 at 7; 6-2 at 7). Both policies also provide, in Section IV, that the insurer has the "right and duty to select counsel and defend" the insured against any claim covered under Paragraph 5.a of Insuring Agreement 5, even if the allegations "are groundless, false or fraudulent." (ECF Nos. 6-1 at 9; 6-2 at 9).

The policies define a "Claim," in relevant part, as either "a written demand for monetary or nonmonetary damages, including but not limited to injunctive relief" or "a civil proceeding commenced by the service of a complaint or similar proceeding" against an insured "for a [w]rongful [a]ct, including any appeal therefrom." (ECF Nos. 6-1 at 18; 6-2 at 19). They also define "Discovery" or "Discovered," in relevant part, as the time when designated senior personnel "first becomes aware of facts which would cause a reasonable person to believe that a [l]oss covered by [the] Policy has been or will be incurred, regardless of when the act or acts causing or contributing to such [l]oss occurred," and they further provide that "Discovered" also includes "the time when any [i]nsured first receives notice of an actual or potential [c]laim in which it is alleged that [the insured is] liable to a third party under circumstances which, if true, would constitute a [covered] [l]oss." (ECF Nos. 6-1 at 19; 6-2 at 19–20).

Each policy's notice condition states that, after a situation that results in, or may result in, a covered loss is discovered, the insured must notify the insurer in writing "as soon as practicable, but not to exceed thirty (30) days from the date Discovered." (ECF Nos. 6-1 at 16; 6-2 at 16–17). That same condition further requires, with respect to Insuring Agreement 5, that the insured immediately "record the specifics of the [c]laim and the date [d]iscovered," "immediately send

3

[…] copies of any demands, notices, summonses or legal papers […],” and assist in enforcement of any rights against potentially liable persons or entities. (*Id.*)

Finally, both policies contain Ohio-specific endorsements, including endorsements that modify portions of Insuring Agreement 5 and the policies' cancellation and nonrenewal provisions. (ECF Nos. 6-1 at 24; 6-2 at 25).

### B. The Underlying Action and HOGT's Notice

In October 2024, Fadel Elkhairi and Mais Khourdaji filed a negligence action in the Franklin County Court of Common Pleas against Heart of Gold Title, LLC and Platinum Real Estate Professionals, LLC d/b/a Platinum Real Estate, Case No. 24-CV-008239. (ECF No. 1 at 3). The complaint alleges that on March 5, 2024, Plaintiffs "received what they believed was an email from Kendall at Heart of Gold Title, but was in fact a scam email from criminal hackers." (ECF No. 6-3 at 4). The complaint further alleges that the scam email "referenced the earnest payment amount of $4,850, and a remaining balance of $480,150," and that the hackers later "sent bogus wiring instructions to the Plaintiffs." (*Id.*). The complaint further alleges that on March 6, 2024, after communications with the scammers (including a voicemail and text-message exchange), Plaintiff Elkhairi wired $480,150 pursuant to "the bogus wiring instructions." (*Id.* at 5–6).

Under the heading "The Fraud is Discovered," the complaint alleges that on March 13, 2024, Plaintiffs confirmed with the real Kendall and others that Heart of Gold had not received the March 6 wire and that the second set of wire instructions appeared to have been sent by someone impersonating the company. (*Id.* at 6). The complaint further alleges that on March 15, 2024, Plaintiffs learned that "the funds were gone" and that "the [real estate] deal was cancelled." (*Id.* at 7).

4

The complaint asserts a single claim for negligence and alleges, among other things, that Defendants breached duties to Plaintiffs by "fail[ing] to observe industry norms" and failing to maintain adequate cybersecurity protocols to detect spoofing (doppelgänger) accounts and to prevent hackers from viewing, intercepting, rerouting, or blocking email communications. (Id. at 8–9). The complaint alleges that, as a direct and proximate result of Defendants' negligence, a third party gathered details of the transaction and, using that information, induced Plaintiffs to tender payment to a bank account not received by Defendants. (*Id.* at 9). Plaintiffs asserted that their damages exceeded $480,150, and requested money damages of the same amount, as well as prejudgment interest, costs, and fees incident to the litigation. (*Id.* at 10).

Heart of Gold, in turn, alleges it received the complaint and summons on October 28, 2024. (ECF No. 6 at 10). Heart of Gold further alleges that ten days later, on November 7, 2024, its broker, Robert H. Cooper, Jr., filed a "Notice of Claim" with Spinnaker/Cowbell concerning the complaint and summons. (*Id.*). It argues that its broker advised Spinnaker/Cowbell that Heart of Gold's response to the state-court complaint was due on November 25, 2024, making the notice "time sensitive." (*Id.* at 11).

On November 8, 2024, Steven Fields (Claims Counsel, Cowbell) sent Heart of Gold a "formal acknowledgment" of the matter "reported today, 11/7/24," identified the matter as "Fraudulent payment," and referenced Claim No. CL01-FLY-2TXEM5Y5U-003 under Policy No. FLY-CB-2TXEM5Y5U-003. (*Id.*; ECF No. 6-5 at 1). That acknowledgment email also listed a "Date of Loss" of March, 13, 2024 and a policy period of August 07, 2023 to August 07, 2024. (ECF No. 6-5 at 1).

Heart of Gold alleges that on November 12, 2024, Mr. Fields (Cowbell) and Heart of Gold's operations manager Clint Hamilton spoke regarding the claim and whether coverage would be

5

provided. (ECF No. 6 at 11). Heart of Gold also states that Mr. Fields then failed to follow up before Heart of Gold's original response deadline and ignored emails sent on November 13, 2024, November 18, 2024, and December 4, 2024. (*Id.* at 12; ECF No. 6-6).

On December 13, 2024, Heart of Gold's counsel sent Mr. Fields a letter requesting an explanation for Cowbell's position and asking Cowbell to "at least" defend "under a reservation of rights," while reciting Heart of Gold's position regarding the complaint and notice dates. (*Id.* at 13; ECF No. 6-8 at 1, 6).

On December 23, 2024, Mr. Fields sent Heart of Gold a letter stating that Cowbell is the claims administrator handling claims on behalf of Spinnaker under both the 2023 and 2024 policies and advising that "there is no coverage available for this matter." (ECF No. 6-9 at 1). The denial letter further asserted that, notwithstanding the information available to the insured, Heart of Gold did not notify Spinnaker "as soon as practicable or within the thirty-day mandate," and therefore Spinnaker disclaimed any duty to defend and indemnify under the 2024 Policy. (*Id.* at 7–8).

### C. The Counterclaims and Motion to Strike

On June 16, 2025, Defendant Heart of Gold Title, LLC ("HOGT") filed its Answer and asserted counterclaims against Spinnaker Insurance Company ("Spinnaker") and Cowbell Insurance Agency, LLC ("Cowbell"). (ECF No. 6).

HOGT asserts three counterclaims: Count I (Breach of Contract), Count II (Bad Faith), and Count III (Declaratory Judgment). (ECF No. 6 at 15–18). In Count I, HOGT alleges that "[t]he Policies are valid contracts between Heart of Gold and Counterclaim Defendants." (*Id.* at 16). HOGT further alleges that it performed under the Policies by "making payments and timely filing its Notice." (*Id.*). HOGT argues that Counterclaim Defendants breached the Policies by (among other things) not paying defense expenses, refusing to pay any covered "loss," and not defending

HOGT in the underlying lawsuit. (*Id.*). HOGT alleges that, as a proximate result of those alleged breaches, it has incurred and continues to incur defense expenses exceeding $25,000. (*Id.*). In Count II, Heart of Gold alleges that Counterclaim Defendants had no reasonable justification for their communication delays, their coverage denial, and advising HOGT to sue Hanover. (*Id.* at 17). HOGT argues that this purported bad faith caused additional damages independent of any contract breach, including additional defense expenses to obtain an extension, lost revenue, increased overhead, lost opportunity cost, and reputational harm exceeding $75,000. (*Id.*). In Count III, Heart of Gold alleges an actual and justiciable controversy exists and asks the Court to declare that Counterclaim Defendants breached the Policies and must provide coverage, reimburse defense expenses, defend HOGT, pay any covered "loss," and that they operated in bad faith. (*Id.*). In its prayer for relief, HOGT seeks (among other things) a money judgment exceeding $75,000, declaratory relief, punitive damages, and such other relief as the Court deems just and fair. (*Id.* at 18).

On July 18, 2025, Spinnaker and Cowbell filed the present Combined Motion under Rule 12(b)(6) seeking dismissal of each cause of action asserted against them in HOGT's Counterclaim. (ECF No. 11). In the alternative, if dismissal is not granted, Spinnaker and Cowbell move under Rule 12(f) to strike paragraphs 44 and 62, the last clause of paragraph 64, subheading K, and Exhibit 10 from the Counterclaim. (ECF No. 11 at 1-2.) The matter is now ripe for review.

## II. STANDARD OF REVIEW

### A. Rule 12(b)(6)

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests whether the pleading states "a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

In deciding a Rule 12(b)(6) motion, the Court must construe the pleading in the light most favorable to the non-moving party, accept all well-pleaded factual allegations as true, and draw all reasonable inferences in that party's favor. *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007) (citation omitted). However, the Court is not required to accept "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action" merely because they are presented as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009) (citation omitted).

To survive dismissal, the pleading must contain sufficient factual matter to state a claim that is "plausible on its face," meaning the facts alleged must permit the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* at 678; *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (citations omitted).

Although the Court generally confines its review to the pleading, it may consider exhibits attached to it and documents incorporated by reference without converting the motion to one for summary judgment. Fed. R. Civ. P. 10(c); *Weiner v. Klais & Co.*, 108 F.3d 86, 89 (6th Cir. 1997); *Bassett v. NCAA*, 528 F.3d 426, 430 (6th Cir. 2008) (citations omitted).

**B. Rule 12(f)**

Federal Rule of Civil Procedure 12(f) authorizes the Court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f).

Motions to strike are generally disfavored and are granted only when the material sought to be stricken has "no possible relation to the controversy." *Brown & Williamson Tobacco Corp. v. United States*, 201 F.2d 819, 822 (6th Cir. 1953) (citations omitted). Because striking material is a "drastic remedy," the Court exercises this power sparingly and typically only when doing so is

required to avoid prejudice. *Id.*; *see* also *Operating Eng'rs Local 324 Health Care Plan v. G&W Constr. Co.*, 783 F.3d 1045, 1050 (6th Cir. 2015).

### III. LAW AND ANALYSIS

#### A. Governing Law and Principles of Insurance Contract Interpretation

Because this Court sits in diversity, it applies the substantive law of the forum state. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). A federal court sitting in diversity also applies the forum state's choice-of-law rules. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941).

Here, the insurance policies at issue were issued to Defendant Heart of Gold Title, LLC, and the coverage dispute arises from an underlying negligence action pending in the Franklin County Court of Common Pleas. (ECF Nos. 6-1 at 1; 6-2 at 1; 6-3 at 1). Neither party meaningfully argues that the law of any jurisdiction other than Ohio should govern the interpretation of the Policies. Accordingly, the Court applies Ohio contract and insurance law to the parties' coverage dispute. *Klaxon Co.*, 313 U.S. at 496-97.

Under Ohio law, insurance policies are contracts and are to "be given their ordinary meaning unless manifest absurdity results or unless some other meaning is clear from the face or overall contents of the agreement." *Cincinnati Ins. Co. v. Anders*, 789 N.E.2d 1094, 1098 (Ohio 2003) (citations omitted). The Court's primary objective is to give effect to the intent of the parties as expressed in the policy language. *Gomolka v. State Auto. Mut. Ins. Co.*, 436 N.E.2d 1347, 1348 (Ohio 1982). Where the terms of the policy are clear and unambiguous, the Court must enforce the policy as written and may not rewrite the contract to create coverage not contemplated by the parties. *Id*. If a policy provision is genuinely ambiguous (i.e., it is susceptible to more than one reasonable interpretation), Ohio law construes the ambiguity strictly against the insurer and

9

liberally in favor of the insured. *Andersen v. Highland House Co.*, 757 N.E.2d 329, 332 (Ohio 2001).

Finally, under Ohio law the duty to defend is broader than the duty to indemnify. *Cincinnati Ins. Co. v. Anders*, 789 N.E.2d 1094, 1097 (Ohio 2003). If the allegations in the underlying complaint potentially or arguably fall within the policy's coverage, the insurer must provide a defense, even if ultimate indemnity is uncertain. *Id*. Conversely, if the insurer has no duty to defend because the allegations fall outside coverage, it necessarily has no duty to indemnify. *Id.*; *NCMIC Ins. Co. v. Smith*, 389 F. Supp. 3d 535, 540 (S.D. Ohio 2019).

### B. Cowbell Is Not a Proper Counterclaim Defendant on These Claims

Spinnaker and Cowbell move to dismiss HOGT's counterclaims against Cowbell on the ground that Cowbell is an insurance producer (claims administrator), not the insurer, and thus is not in contractual privity with HOGT under the Policies. (ECF No. 11-1 at 3).

The Policies' declarations pages identify Spinnaker Insurance Company as the "Company Name" providing the insurance and identify Cowbell Insurance Agency LLC as the "Producer Name." (ECF Nos. 6-1 at 1; 6-2 at 1). Consistent with those declarations pages, the coverage correspondence in the record describes Cowbell as "the claims administrator handling claims on behalf of Spinnaker Insurance Company." (*See, e.g.*, ECF No. 6-9 at 1).

Nevertheless, HOGT pleads that "[t]he Policies are valid contracts between Heart of Gold and Counterclaim Defendants," and it asserts that Cowbell and Spinnaker breached those contracts by failing to defend and by refusing to pay "loss" and "defense expenses." (ECF No. 6 at 16). HOGT likewise seeks declaratory relief requiring Cowbell (along with Spinnaker) to provide coverage and a defense under the Policies. (*Id.* at 18).

10

Under Ohio agency law, "[a]n agent who acts for a disclosed principal and who acts within the scope of his authority and in the name of the principal is ordinarily not liable on the contracts he makes." *Plain Dealer Publ'g Co. v. Worrell*, 898 N.E.2d 1009, 1011 (Ohio Ct. App. 2008); *James G. Smith & Assocs., Inc. v. Everett*, 439 N.E.2d 932, 933 (Ohio Ct. App. 1981) (syllabus ¶ 1) (citations omitted).

Here, the Policies disclose Spinnaker as the contracting insurer and identify Cowbell only as the producer. (ECF Nos. 6-1 at 1; 6-2 at 1). Because Cowbell is not the contracting insurer under the Policies, HOGT has not plausibly pleaded contractual privity with Cowbell sufficient to maintain its contract-based counterclaims against Cowbell. (ECF No. 6 at 16).

The same conclusion follows for Heart of Gold's bad-faith claim against Cowbell. (*Id.* at 17). Ohio recognizes a tort claim for bad faith based on "the relationship between an insurer and its insured," and a breach of that duty "will give rise to a cause of action in tort against the insurer." *Hoskins v. Aetna Life Ins. Co.*, 452 N.E.2d 1315, 1319 (Ohio 1983) (syllabus ¶ 1) (citation omitted). Accordingly, where the defendant is not the insurer on the policy, the necessary insurer-insured relationship is, as a result, absent, and the pleaded bad-faith theory fails as a matter of law. *Id.*; *Zoppo v. Homestead Ins. Co.*, 644 N.E.2d 397, 399 (Ohio 1994) (syllabus ¶ 1) (citations omitted). The record unmistakenly confirms Cowbell is not the "Company" that issued the Policies and instead is identified as the producer/claims administrator, while Spinnaker is identified as the insurer. (ECF Nos. 6-1 at 1; 6-2 at 1; 6-9 at 1).

Finally, HOGT's declaratory-judgment counterclaim against Cowbell fails for the same reason. (ECF No. 6 at 18). The Declaratory Judgment Act authorizes relief only in a "case of actual controversy" between the parties. 28 U.S.C. § 2201(a). Because Cowbell is not the insurer under the Policies and Heart of Gold's requested declarations concern duties to defend and indemnify

11

arising from the insurance contract, HOGT has not pleaded an actual controversy with Cowbell over those contractual obligations.

For these reasons, the Court dismisses all counterclaims asserted against Cowbell.

### C. No Plausible Coverage Exists Under the 2023 Policy

The 2023 Policy is a "claims-made and reported" policy that applies "only to claims first made and reported to the insurer during the policy period." (ECF No. 6-1 at 1). The policy period for the 2023 Policy ran from August 7, 2023 to August 7, 2024. (*Id.*) As relevant here, Insuring Agreement 5, Section I provides coverage for "Loss" and "Defense Expenses" resulting from "a Claim that is Discovered during the Policy Period." (ECF No. 6-1 at 1, 7). The 2023 Policy defines a "Claim," in relevant part, as (1) "[a] written demand for monetary or nonmonetary damages" or (2) "[a] civil proceeding commenced by the service of a complaint or similar proceeding." (ECF No. 6-1 at 18).

HOGT does not plead that it received any written demand from the underlying plaintiffs before suit. In fact, it alleges it "never received anything from Fadel Elkhairi or Mais Khourdaji that indicated they planned on bringing a claim against it." (ECF No. 6 at 10). Thus, the first definition does not apply, and, on HOGT's own pleading, the earliest plausible "Claim" (as that term is defined) is the state-court negligence action commenced by service of the complaint and summons (filed in Franklin County Court of Common Pleas on October 25, 2024; received by HOGT on October 28, 2024—several months after the 2023 Policy expired on August 7, 2024). (ECF Nos. 6-1 at 18; 6 at 10; 6-3). HOGT further alleges that it reported the lawsuit to Spinnaker/Cowbell on November 7, 2024 (thus, also after the 2023 Policy expired). (ECF No. 6 at 10).

12

Therefore, even on the face of the counterclaim, the Underlying Action was neither "first made" nor "reported" during the 2023 Policy period, as the contract requires. And because the coverage form also conditions coverage on the claim being "first discovered" during the policy period, HOGT's pleaded discovery date (October 28, 2024) likewise forecloses coverage under the 2023 Policy.

This conclusion follows not only from the contract's unambiguous text, but also from settled Ohio insurance principles governing claims-made policies. Under Ohio law, courts enforce unambiguous insurance language as written, giving effect to the parties' chosen risk allocation. *Elkins v. Am. Int'l Special Lines Ins. Co.*, 611 F. Supp. 2d 752, 761 (S.D. Ohio 2009). In particular, "a claims made policy provides coverage for claims brought against the insured only during the life of the policy," and the reporting requirement is "the very essence" of the bargain because it allows the insurer to "close its books" at expiration and avoid assuming risks outside the agreed period. *Id.* at 761-62 (cleaned up). The Ohio Sixth District has similarly recognized that "under a claims-made policy, notice of an action against the insured must be presented to the insurer within the designated time of the policy." *Helberg v. Nat'l Union Fire Ins. Co.*, 657 N.E.2d 832, 833 (Ohio Ct. App. 1995) (citations omitted).

Accordingly, because HOGT pleads that the Underlying Action was served and reported only after the 2023 Policy period ended, it fails to allege facts that could plausibly trigger coverage under the 2023 Policy. To the extent Counts I and III seek relief premised on an alleged breach of, or a declaration of coverage under, the 2023 Policy, those theories fail as a matter of law.

For these reasons, the Court dismisses all counterclaims asserted under the 2023 Policy.

### D. No Plausible Coverage Exists Under the 2024 Policy

Generally, the 2024 Policy is expressly written on a "claims-made and reported basis" and applies "only to claims first made and reported to the insurer during the policy period." (ECF No. 6-2 at 1). The 2024 Policy's policy period runs from August 7, 2024 to August 7, 2025. (*Id.*) As relevant here, the 2024 Policy contains a notice condition (Condition 14) titled "Duties in the Event of Claim or Loss." (ECF No. 6-2 at 16). The 2024 Policy also contains an exclusions section that includes Exclusion 16 addressing prior awareness of a "Cyber Incident, Extortion Threat, Security Breach, Wrongful Act, or Interrelated Wrongful Acts." (ECF No. 6-2 at 18).

### 1. Heart of Gold Pleads Facts Establishing Untimely Notice Under Condition 14

Condition 14, Section VI provides that "[a]fter a situation that results in, or may result in, a Loss covered under this Policy is Discovered," the insured "must notify [the insurer] in writing as soon as practicable, but not to exceed thirty (30) days from the date Discovered." (*Id.* at 16–17). The 2024 Policy defines "Discovery or Discovered" as the time when specified senior personnel "first becomes aware of facts which would cause a reasonable person to believe that a Loss covered by this Policy has been or will be incurred," even if "the exact amount or details of Loss may not then be known." (*Id.* at 20). The definition further provides that "Discovery or Discovered *also* means the time when any Insured first receives notice of an actual or potential Claim" alleging third-party liability under circumstances that, if true, would constitute a covered Loss. (*Id.*) Thus, the definition contains a "reasonable person" trigger that does not depend on the insured's subjective belief about liability and does not require that a civil action already have been filed. (*Id.*)

HOGT alleges that the relevant events in the Underlying Action occurred "between February 2024 and March 2024." (ECF No. 6 at 10). HOGT further pleads that "[i]mmediately after these events," its "IT vendor conducted a review of its information systems to see if they were

14

infiltrated," and the vendor "confirmed" the systems were not infiltrated. (*Id.*). HOGT nevertheless pleads that it did not provide notice to Spinnaker/Cowbell until November 7, 2024, when its broker, Robert H. Cooper Jr., filed a "Notice of Claim." (*Id.*). Cowbell's acknowledgment email dated November 8, 2024, likewise reflects the matter was "reported today, 11/7/24." (ECF No. 6-5).

On these pleadings, HOGT's allegation that it "had no reason to believe it would face liability until the Complaint was filed in October" does not plausibly establish compliance with Condition 14 because that condition is triggered by discovery of a situation which may result in a covered Loss, not by the filing of a lawsuit. (ECF No. 6 at 10). And the Policy's definition of "Discovered" confirms that the notice obligation is triggered when senior personnel become aware of facts that would cause a reasonable person to believe a covered Loss "has been or will be incurred," even if the "exact amount or details" are not yet known. (ECF No. 6-2 at 20).

Given HOGT's own allegations that the operative events occurred "between February 2024 and March 2024" and that it immediately undertook an IT review to assess infiltration, the Counterclaim pleads facts establishing that the relevant "situation" was discovered, at a minimum, seven months before November 2024. (ECF No. 6 at 10).

Accordingly, because the Policy imposes a hard deadline of "not to exceed thirty (30) days from the date Discovered," HOGT's pleaded notice date (November 7, 2024) falls outside the contractual reporting window (April 30, 2024, at the latest).

### *2. Exclusion 16 Independently Bars Coverage Under the 2024 Policy*

Exclusion 16, Section V bars coverage for "[a]ny Cyber Incident, Extortion Threat, Security Breach, Wrongful Act, or Interrelated Wrongful Acts that any Insured became aware of prior to the effective date of the Policy." (ECF No. 6-2 at 10).

15

The effective date of the 2024 Policy is August 7, 2024. (ECF No. 6-2, PageID #191.) HOGT pleads that the operative events occurred between February and March 2024 and that it responded "immediately" by initiating an IT review. (ECF No. 6, PageID #131, ¶¶ 18-19.) Those pleaded facts place HOGT's awareness of the underlying incident, as well as its investigation of that incident, well before August 7, 2024.

Accordingly, even apart from Condition 14's notice requirement, Exclusion 16 provides an independent contractual basis foreclosing coverage under the 2024 Policy as pleaded.

### 3. Helberg Does Not Save the Counterclaims

HOGT relies on *Helberg v. National Union Fire Insurance Co.* for the proposition that a renewal of a claims-made policy should not create a "trap wherein claims spanning the renewal are denied." *Helberg v. Nat'l Union Fire Ins. Co.*, 657 N.E.2d 832, 834 (Ohio Ct. App. 1995). But *Helberg* turned on the specific contract language before the Sixth District, including exclusion language providing that coverage applied to claims arising out of acts "prior to the effective date of the first policy issued […] and continuously renewed thereafter". *Id.* (quoting policy language). The *Helberg* court's analysis also referenced the policy's "Extended Reporting Endorsement" provision, which was triggered "[i]n case of cancellation or non-renewal," further informing the court's view of how reporting operated across renewals in that contract. *Id.* at 834-35.

Here, by contrast, the 2024 Policy contains an express hard deadline requiring notice "not to exceed thirty (30) days from the date Discovered." (ECF No. 6-2 at 16). And the 2024 Policy contains an express prior-awareness exclusion (Exclusion 16) barring coverage for incidents or wrongful acts of which "any [i]nsured became aware" before the policy's effective date. (*Id.*).

The same exclusions section also includes Exclusion 17 barring coverage for "the same facts" alleged in "any [c]laim which has been reported, or in any circumstances of which notice

16

has been given, under any insurance policy of which this Policy is a renewal or replacement," meaning the 2024 Policy, unlike the insurance policy in *Helberg*, does not treat renewal as a mechanism to extend reporting for previously known incidents. (*Id.* at 11); *Helberg v. Nat'l Union Fire Ins. Co.*, 657 N.E.2d 832, 834-35 (Ohio Ct. App. 1995).

Accordingly, the Policy language here does not plausibly support a "continuous renewal" construction that would override the Policy's fixed reporting requirement and prior-awareness exclusions. Furthermore, because HOGT's counterclaims seek contract-based relief premised on a duty to defend and indemnify under the 2024 Policy, and because HOGT's pleaded facts trigger both Condition 14's untimely-notice bar and Exclusion 16's prior-awareness bar, *Helberg* does not salvage HOGT's requested relief.

For these independent reasons, Heart of Gold fails plausibly to plead coverage under the 2024 Policy, and Counts I and III fail to the extent they seek relief predicated on alleged coverage under that Policy.

### E. Bad Faith Fails as a Matter of Law on These Pleadings

Heart of Gold asserts a counterclaim for insurer bad faith against Spinnaker and Cowbell based on alleged: (1) communication delays; (2) denial of coverage; (3) advice to sue Hanover; and (4) differential treatment compared to another insured's *Tran v. Elite Land Title LLC, et al.* (Franklin County Court of Common Pleas, Case No. 23 CV 3402) matter. (ECF No. 6 at 14, 17).

Under Ohio law, an insurer owes its insured a duty to act in good faith in the handling and payment of claims. *Hoskins v. Aetna Life Ins. Co.*, 452 N.E.2d 1315, 1319 (Ohio 1983) (cleared up). An insurer acts in bad faith when its refusal to pay a claim is not predicated upon circumstances that furnish "reasonable justification." *Zoppo v. Homestead Ins. Co.*, 644 N.E.2d 397, 399-400 (Ohio 1994). Reasonable justification does not exist where an insurer's refusal to

17

pay is arbitrary or capricious, and an adverse coverage decision, standing alone, does not establish bad faith. *City of E. Liverpool v. Owners Ins. Co.*, 171 N.E.3d 1207 (Ohio Ct. App. 2021) (cleared up).

Ohio courts also recognize that an insurer may act in bad faith through conduct other than an express denial of coverage, including "foot-dragging" or unreasonable delay in the claim-handling and evaluation process. *The Scott Fetzer Co. v. Am. Home Assurance Co.*, 2022-Ohio-1062, ¶¶ 12, 23-24 (Ct. App). Even under this broader conception, however, the pleading must plausibly allege that the insurer's conduct lacked reasonable justification. *Zoppo v. Homestead Ins. Co.*, 644 N.E.2d 397, 399-400 (Ohio 1994).

Here, Heart of Gold's bad-faith theory is tethered to Spinnaker's refusal to provide a defense and coverage in the Underlying Action and to Cowbell's alleged handling of the claim. (ECF No. 6 at 17). As explained above in Part III.B, HOGT's own allegations and the Policy terms establish that the Underlying Action was served and reported after the 2023 Policy period ended, foreclosing coverage under that policy. *See supra* Part III.B. HOGT's pleadings further establish that the operative fraud events occurred in February-March 2024 and that HOGT immediately investigated. (ECF No. 6 at 10). Yet HOGT alleges it did not provide notice until November 7, 2024. (*Id.*). The 2024 Policy, however, required notice "as soon as practicable, but not to exceed thirty (30) days from the date Discovered," and it defined "Discovered," in relevant part, as when senior personnel become aware of facts that would cause a reasonable person to believe a covered loss "has been or will be incurred," even if the "exact amount or details" are not yet known. (ECF No. 6-2 at 16, 20).

Thus, on the face of HOGT's pleaded timeline, Spinnaker had at least a strong contractual basis to deny coverage on timeliness grounds under Condition 14 and on prior-awareness grounds

18

under Exclusion 16. Further, because the denial rests on facially applicable policy terms and an undisputed sequencing of dates as pleaded, Heart of Gold has not plausibly alleged that Spinnaker's refusal was arbitrary, capricious, or otherwise lacking reasonable justification. *Zoppo v. Homestead Ins. Co.*, 644 N.E.2d 397, 399-400 (Ohio 1994). Nor do HOGT's allegations regarding communication delays plausibly transform this contract-based coverage dispute into a tort claim because the counterclaim does not allege facts permitting a reasonable inference that Spinnaker's claim-handling posture was unjustified in light of the policy's claims-made-and-reported structure and the notice provisions at issue. (ECF No. 6, *passim*.) Similarly, HOGT's allegations that Cowbell advised it to sue Hanover or treated the "*Tran*" matter (*Tran v. Elite Land Title LLC, et al.* (Franklin County Court of Common Pleas, Case No. 23 CV 3402) differently do not plausibly establish the absence of reasonable justification for Spinnaker's denial under the operative policy provisions. (ECF No. 6 at 17).

Accordingly, because Heart of Gold fails to plead facts that would support a reasonable inference that Spinnaker lacked "reasonable justification" for its coverage position, Count II fails to state a claim for bad faith. Count II is therefore dismissed.

**F. Declaratory Judgment and Specific Performance Are Derivative and Also Fail**

HOGT's Count III seeks declaratory relief against Spinnaker and Cowbell regarding their alleged duties under the Policies. (*Id.* at 17–18).

The Declaratory Judgment Act provides that, "[i]n a case of actual controversy within its jurisdiction," a federal court "may declare the rights and other legal relations of any interested party." 28 U.S.C. § 2201(a). The Act is "procedural only" and does not itself create substantive rights or an independent cause of action. *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950) (quotation omitted).

19

Here, Heart of Gold asks the Court to declare that Counterclaim Defendants breached the Policies and "must provide coverage," reimburse HOGT's defense expenses, defend HOGT against the underlying complaint, pay any covered "loss," and "operated in bad faith." (*Id.* at 18). These requested declarations are entirely premised on the existence of contractual duties to defend and indemnify under the Policies and on the viability of HOGT's contract- and bad-faith theories. (*Id.* at 16–18).

Because the Court concludes that HOGT has not plausibly pleaded coverage under either the 2023 Policy or the 2024 Policy and therefore fails to state a claim for breach of contract, there is no contractual duty for the Court to declare in HOGT's favor. *See id.; see also supra* Parts III.B-III.C. For the same reasons, because the Court dismisses HOGT's bad-faith counterclaim, HOGT likewise fails to state a plausible basis for the declaration that Counterclaim Defendants "operated in bad faith."

Accordingly, Count III fails to state a claim and is dismissed. To the extent HOGT's request for relief seeks the functional equivalent of specific performance (i.e., an order requiring a defense, reimbursement of defense expenses, payment of "loss") that relief is derivative of the asserted contractual coverage obligation and fails for the same reasons.

### G. Motion to Strike

Spinnaker and Cowbell alternatively move under Rule 12(f) to strike paragraphs 44 and 62, the last clause of paragraph 64, subheading "K," and Exhibit 10 from Heart of Gold's Counterclaim. (ECF No. 11 at 1–2).

Rule 12(f) permits a court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Because the Court

20

dismisses HOGT's Counterclaim in full, there is no operative pleading from which to strike allegations or exhibits, and the Motion to Strike is therefore denied as **MOOT**.

## IV. CONCLUSION

For the reasons above, Plaintiffs/Counterclaim Defendants' Combined Motion to Dismiss (EFC No. 11) is **GRANTED**. Heart of Gold Title, LLC's Counterclaims (EFC No. 6) are **DISMISSED WITH PREJUDICE.** The Motion to Strike (EFC No. 11) is **DENIED AS MOOT.**

**IT IS SO ORDERED.**

_____
**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**

**DATED: March 13, 2026**

21